

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-1999

# Pivirotto v. Innovative Systems, Inc.

Precedential or Non-Precedential:

Docket 98-3609

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Pivirotto v. Innovative Systems, Inc." (1999). *1999 Decisions.* Paper 249.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/249

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 7, 1999

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

NO. 98-3609

PATRICIA M. PIVIROTTO Appellant

v.

INNOVATIVE SYSTEMS, INC.

On Appeal From the United States District Court For the Western District of Pennsylvania (D.C. Civ. No. 96-cv-02292) District Judge: Honorable Clarence C. Newcomer (Sitting by Designation)

Argued: July 13, 1999

Before: BECKER, Chief Judge, ROTH, and RENDELL, Circuit Judges.

(Filed September 7, 1999)

SAMUEL J. CORDES, ESQUIRE (ARGUED) MARY R. ROMAN, ESQUIRE Ogg, Jones, Cordes & Ignelzi 245 Fort Pitt Boulevard Pittsburgh, PA 15222 Counsel for Appellant

JAMES B. BROWN, ESQUIRE (ARGUED) NANCY L. HEILMAN, ESQUIRE MICHELLE S. PIERSON, ESQUIRE Cohen & Grigsby, P.C. 11 Stanwix Street, 15th Floor Pittsburgh, PA 15222 Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This appeal from a judgment entered on a jury verdict for the defendant-employer in a Title VII gender-discrimination case brought by a discharged female employee calls upon us to decide the correctness of an instruction to the jury that it was required to return a verdict in favor of the defendant if it did not find that the plaintiff had been replaced by a male. We join seven other circuits in holding that a plaintiff claiming discriminatory firing need not prove, to make out a prima facie case, that she was replaced by someone outside the relevant class. 1 We nonetheless will affirm the judgment of the District Court on the ground that the erroneous jury instruction was harmless.

(Text continued on page 4) _____

1. In reaching this conclusion, the mere fact that the issue arose in the context of a jury instruction is immaterial. We note, however, that it is anomalous that this issue is presented in the context of a jury charge, for the determination of whether a prima facie case has been made out is a legal one for the court. Although the appellant raised this point for the first time in her opening brief on appeal (it was not raised in the district court and hence arguably waived as a possible basis for reversal), she receded from it in her reply brief. However, because there is apparently some confusion on the issue, we comment upon the question for the guidance of the district courts within the circuit.

In Walther v. Lone Star Gas Co., 952 F.2d 119, 127 (5th Cir. 1992), the court noted that "the issue of whether a plaintiff made out a prima facie case has no place in the jury room. Instructing the jury on the elements of a prima facie case, presumptions, and the shifting burden of proof is unnecessary and confusing." Similarly, in Ryther v. KARE 11, 108 F.3d 832 (8th Cir. 1997), the court observed that "instructions incorporating the McDonnell Douglas paradigm `add little to the juror's understanding of the case and, even worse, may lead jurors to abandon their own judgment and to seize upon poorly understood legalisms to decide the ultimate question of discrimination.' " Id. at 850 n.15 (Loken, J., for majority of en banc court) (quoting Grebin v. Sioux Falls Indep. Sch. Dist. No. 49-5, 779 F.2d 18, 20 (8th Cir. 1985)). In general, we agree.

There is some dispute among the circuits as to whether the broader aspects of McDonnell Douglas burden shifting have any place in a jury charge. In Smith v. Borough of Wilkinsburg, 147 F.3d 272, 280 (3d Cir. 1998), we held that jurors must be instructed that they are entitled to infer, but need not, that the plaintiff 's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they find that the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision.

At the same time, we also observed that "this does not mean that the instruction should include the technical aspects of the McDonnell Douglas burden shifting, a charge reviewed as unduly confusing and irrelevant for a jury." Id. at 280 n.4.

The Wilkinsburg holding sprang from the district court's refusal to instruct the jury that it could infer intentional discrimination if it disbelieved the Borough's asserted reasons for not renewing Smith's contract. In the more common situation, however, as the Seventh Circuit observed in Hennessy v. Penril Datacomm Networks, Inc.:

Once the judge finds that the plaintiff has made the minimum necessary demonstration (the "prima facie case") and that the defendant has produced an age-neutral explanation, the burden- shifting apparatus has served its purpose, and the only remaining question--the only question the jury need answer--is whether the plaintiff is a victim of intentional discrimination.

69 F.3d 1344, 1350 (7th Cir. 1995) (quoting Gehring v. Case Corp., 43 F.3d 340, 343 (7th Cir. 1994)); see also United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-15 ("But when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff 's proof by offering evidence of the reason for the plaintiff 's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage, the McDonnell-Burdine presumption `drops from the case,' and `the factual inquiry proceeds to a new level of specificity.' ") (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 & n.10 (1981)). As the Eighth Circuit explained:"Since Hicks, [St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)] other circuits have held that instructions should normally be limited to the ultimate discrimination issue." Ryther, 108 F.3d at 849 (Loken, J., for majority of en banc court); see also Woodhouse v. Magnolia Hosp., 92 F.3d 248, 257 (5th Cir. 1996) ("[I]t is improper to instruct the jury on the elements of the prima facie case."); Gehring v. Case Corp., 43 F.3d 340, 343 (7th Cir. 1994)  ("[T]he only question the jury need answer--is whether the plaintiff is a victim of intentional discrimination.").

The short of it is that judges should remember that their audience is composed of jurors and not law students. Instructions that explain the subtleties of the McDonnell Douglas framework are generally inappropriate when jurors are being asked to determine whether intentional discrimination has occurred. To be sure, a jury instruction that contains elements of the McDonnell Douglas framework may sometimes be required. For example, it has been suggested that "in the rare case when the employer has not articulated a legitimate nondiscriminatory reason, the jury must decide any disputed elements of the prima facie case and is instructed to render a verdict for the plaintiff if those elements are proved." Ryther, 108 F.3d at 849 n.14 (Loken, J., for majority of en banc court) (citing Hicks, 509 U.S. at 509-10 & n.3). But though elements of the framework may comprise part of the instruction, judges should present them in a manner that is free of legalistic jargon. In most cases, of course, determinations concerning a prima facie case will remain the exclusive domain of the trial judge.

_____

I. Facts & Procedural History

Defendant Innovative Systems, Inc. ("ISI") is a consulting company founded in 1968 by Robert Colonna. At all times relevant to this case, Colonna was the company's Chairman and one of its two shareholders. Plaintiff Patricia Pivirotto was hired by ISI in October 1995 as Director of Eastern Regional Sales Operations, at an annual salary of $125,000. This made Pivirotto the third highest paid employee in the company. In May 1996, ISI hired Gary Fiedler as its Chief Operating Officer. Colonna testified that he hired Fiedler so that he (Colonna) could spend more time with his family and less time running the company. Once Fiedler was brought on board, Colonna reduced his workweek from sixty hours to about five hours. Fiedler was hired to run the day-to-day operations of the company and to "develop a strong management team behind him." Colonna testified that Fiedler was given responsibility over

personnel decisions. Although Colonna maintained the "final word" on such matters, he testified that he gave Fiedler a great deal of autonomy because he was "the type of executive that, if he was second guessed or managed day-to-day," would immediately leave the company.

On June 10, 1996, less than a month after Fiedler was hired, Fiedler summoned Pivirotto's supervisor, Jose Garcia, from vacation and fired him. He thereupon promoted Pivirotto to Garcia's position, Director of North American Sales. However, a week later, Fiedler fired Pivirotto from this position. Colonna testified that the decision to terminate Pivirotto was completely Fiedler's: "Ms. Pivirotto did not work for me. I don't tell my subordinates to terminate people. I never have." Colonna conceded that he met with Fiedler the day before Pivirotto's firing, but claimed that he simply inquired as to whether Fiedler was certain he wanted to fire Pivirotto, or whether there was any way to "keep her on."

Fiedler, who (like Colonna) testified that the decision to terminate Pivirotto was his, claimed at trial that he told Pivirotto "that we were terminating her employment because she had demonstrated a tendency to blame others for problems in the sales organization and that that had the effect of driving a wedge between her organization and other parts of the company." Pivirotto apparently demonstrated her tendency to blame others at a staff meeting the day of her firing, at which she complained that ISI's in-house counsel was doing a poor job of negotiating a contract with a key client. Additionally, shortly before this staff meeting, Pivirotto had complained to Fiedler that "there was an inadequate amount of sales support resource being allocated to the sales organization." Yet Fiedler testified that his own analysis established that Pivirotto was receiving at least as much support (measured in terms of person-hours) as she indicated that she needed. Pivirotto testified at trial that Fiedler told her at the time of her firing "that he felt that I was a wedge between sales and marketing and that my services were no longer compatible with the company." The company's separation letter to Pivirotto, signed by Frank Ruggieri, Vice President for Human Resources and Administration, stated that her firing "has become necessary due to a shift in the organization's business strategy and the decision that your approach is incompatible with the subsequent goals and objectives of this strategy."

The evidence presented at trial indicated that Pivirotto was not immediately "replaced" by anyone, male or female. Rather, her job responsibilities were assumed by Robert Keatley, a male employee responsible for sales support. It is noteworthy that the jury instructions explicitly required Pivirotto to prove that she was "replaced by a man." Although her job responsibilities were "assumed" by an existing male employee, ISI argued that Pivirotto was not "replaced" by a man, and in fact, ISI sought judgment as a matter of law at the close of Pivirotto's case on the ground that "quite simply . . . the Plaintiff has not adduced any credible evidence indicating that she was replaced by a male." After presenting its own case, ISI again moved for judgment as a matter of law: "Plaintiff has not and cannot prove an important part of her prima facie case. And that is that she was, in fact, replaced as the director of North American sales."

Although there was no evidence that Pivirotto was "replaced" by a man, she offered other evidence of discrimination. Most prominently, she testified that Colonna had often told her "that women were not as dependable or as reliable as men." She explained that these statements were made in the context of Colonna's observation that women were less reliable because they would get pregnant or sick with breast cancer. Another former ISI employee, Nancy Egan, testified similarly that Colonna had complained to her that women were riskier employees than men because they could become pregnant or get breast cancer. Colonna did not deny making such comments. However, he claimed he made them only in the context of expressing a concern that "if you lose your whole staff it really can ruin a whole company," and he testified that "we lost our whole staff, and the company sales declined" due to a number of women getting pregnant or sick at the same time.

In addition to the remarks by Colonna, Pivirotto offered evidence that a male ISI attorney suffered no adverse job consequences even though he "had difficulty taking instruction from sales to get things done." Pivirotto was also given less than a week in her final position (Director of North American Sales), while Garcia, her male predecessor, was not fired until about a month after Fiedler was brought on board.

Six months after her termination, Pivirotto brought the present Title VII claim in the United States District Court for the Western District of Pennsylvania. Following a number of pretrial rulings on evidentiary issues, a two-day jury trial was held. At the close of all the evidence, ISI moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The District Court denied the motion. A charge conference was then held, at which time Pivirotto raised two objections to the proposed jury instructions. The only objection relevant to this

appeal was to a paragraph of the instructions in which the court explained to the jury that Pivirotto was an at-will employee, and, in such an employment relation, "both the employer and the employee are generally free to terminate the employment relationship at any time for any reason, good or bad." The District Court denied Pivirotto's objection to this instruction.

ISI also lodged a number of objections, including one to the court's proposed instruction on the prima facie case. It argued that the jury should be instructed that Pivirotto could meet her burden of establishing a prima facie case of gender discrimination only by showing that she was replaced by a man, and not by proving that "men in a similar position were treated more favorably than she was." The court sustained this objection. Therefore, the jury was instructed that "the Plaintiff must first establish . . . by a preponderance of the evidence . . . that she was replaced by a man." Following deliberations, the jury returned a verdict in ISI's favor. The District Court then entered a judgment for ISI. Pivirotto timely appealed.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. Our review of the first allegation of error (regarding replacement by a male) is plenary, as Pivirotto claims that the District Court misstated the law regarding the prima facie case. See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997) ("We generally review jury instructions for abuse of discretion, but our review is plenary when the question is whether the instruction misstates the law . . . ."), cert. denied, 118 S. Ct. 1516 (1998). We consider the jury instructions as a whole to determine whether the District Court abused its discretion in giving the at-will employment instruction. See Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989). We will not reverse a verdict on the ground that a jury instruction was erroneous if "it is highly probable that the error did not contribute to the judgment." Murray v. United of Omaha Life Ins. Co., 145 F.3d 143, 156 (3d Cir. 1998) (internal quotation omitted).

II. The Jury Instructions

Pivirotto claims that the District Court's jury instructions were erroneous in two respects. First, she alleges that it was error for the District Court to charge the jury that it must find in ISI's favor if it concluded that Pivirotto was not replaced by a man. She also avers that the District Court erred in including any mention of her at-will employment relationship. We reject the latter contention in the margin.2
_____

2. The District Court's at-will instruction to the jury was:

You should know that the Plaintiff was an at will employee of Innovative. In an at-will employment relationship, both the employer and the employee are generally free to terminate the employment relationship at any time for any reason, good or bad, thus an at-will employee may be terminated at any time for any reason or no reason at all, so long as the reason is not based on discrimination, which the law prohibits.

App. at 543. Few courts have addressed the propriety of giving an at-will instruction in a statutory discrimination case, although the Seventh Circuit has expressed doubt that such instructions should be given. See Achor v. Riverside Golf Club, 117 F.3d 339, 341 (7th Cir. 1997) ("Whether a given employee serves at will, or for a term of years, or under a contract requiring `good cause' for discharge, is neither here nor there . . . .").

Initially, we reject ISI's contention that Pivirotto did not adequately object to the at-will jury instruction. During the charge conference, her counsel gave the district court "notice of potential errors" in the instruction and provided "the underlying basis for the objection." United States v. Russell, 134 F.3d 171, 178-79 & n.4 (3d Cir. 1998); see also Fed. R. Civ. P. 51. Therefore, she adequately preserved this issue.

Whatever the propriety of giving an at-will instruction, it is clear in the present case that any error that arose from the instruction was harmless. After giving the above instruction, the District Court gave detailed instructions on the specifics of a Title VII sex-discrimination claim, including the plaintiff 's overall burden, the multiple ways of meeting the burden, the prima facie case, and the burden-shifting analysis. And, as the reader will have noted, the at-will instruction concluded with the clause, "so long as the reason is not based on discrimination, which the law prohibits."  Under these circumstances, we think it is "highly probable" that the jury did not conclude that ISI fired

Pivirotto because of her sex, but still returned a verdict for ISI solely because it believed that, as an at-will employee, Pivirotto could be fired for any reason. See Murray, 145 F.3d at 156.

Moreover, the instruction was neither factually inaccurate nor legally erroneous. Pivirotto does not dispute that she was an at-will employee, and that she could be "terminated at any time for any reason or no reason at all, so long as the reason is not based on discrimination." The better practice may be for a district court to not give such an instruction in a statutory discrimination case, especially when neither party requests it. But ISI did request the instruction in this case, and there may be some cases in which the employer may be able to demonstrate that such an instruction is helpful to the jury in providing a background understanding of the employment relationship and in ensuring that the jury does not make any improper inferences (such as that the employer is liable if it did not have a good reason for discharging the plaintiff). On the other hand, in some cases the relevant instruction would be that the employer could only fire the plaintiff for "just cause" (as in many union settings), rather than that it could terminate her for "any reason or no reason at all."

_____

Turning to Pivirotto's primary contention, the District Court instructed the jury that Pivirotto could prove her case through direct or indirect evidence. Regarding the latter, it charged:

[T]he Plaintiff must first establish the following facts by a preponderance of the evidence. First, that she is a woman, which you may take as proven; secondly, that she was qualified for the position from which she was terminated; third, that she was discharged; fourth, that she was replaced by a man.

If you find that the Plaintiff has not established any one of the above four elements by a preponderance of the evidence, then you must find for the Defendant.
App. at 545-46.3

The court then instructed the jury as to its task if it found that Pivirotto had proved each of these four elements of the prima facie case by a preponderance of the evidence. See id. at 546-47. Pivirotto claims that this instruction was legally erroneous because a Title VII plaintiff need not prove that she was replaced by someone outside of her class in order to establish a prima facie case. ISI responds that the only exception to the requirement that the plaintiff prove she was replaced by someone outside her class is in a reduction-in-force case, in which no one (of the same or another class) replaces the plaintiff.

A.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a failure-to-hire case, the Supreme Court outlined the prima facie case that a plaintiff must establish, listing four elements: that plaintiff is a member of the protected class, that he was qualified for the position for which he applied, that he was not hired despite his qualifications, and that, "after his rejection, the position remained open and the employer continued to seek applicants from

_____

3. Although it did not use the term, the District Court was clearly referring to the familiar prima facie case of a gender-discrimination claim. As noted above, the court had originally intended to instruct the jury that, for the fourth element, Pivirotto must prove that she was replaced by a man or that "men in a similar position were treated more favorably than she was." App. at 491. The District Court sustained ISI's objection to the latter portion of the fourth element, and did not include it in its final charge to the jury.

_____

persons of complainant's qualifications." Id. at 802.4 Immediately following this description of the prima facie case, the Court included this footnote: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations." Id. at 802 n.13.

Nowhere did the Court describe the fourth element as hiring of (or, by implication, replacement by) a person outside the plaintiff 's class. If that were the case, in McDonnell Douglas itself, the fourth element would have been that the defendant hired a white person for the position, not that it continued to seek applicants for the applied-for position.

As the Court has often noted, a major purpose of the prima facie case is to eliminate the most obvious, lawful reasons for the defendant's action (i.e., the position that an applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually taken, etc.). See, e.g., Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981) ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff 's rejection."). Earlier, in Furnco Construction Corp. v. Waters , 438 U.S. 567 (1978), the Court explained the purpose of the prima facie case at length:

_____

4. The general rules surrounding the prima facie case and burden shifting under Title VII are quite familiar, and we rescribe them here only briefly. A plaintiff may present either direct or indirect evidence to prove that she was subjected to unlawful discrimination. See Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998). In indirect-evidence cases, the plaintiff must first make a prima facie showing of discrimination. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). If the plaintiff cannot do so, the defendant is entitled to judgment as a matter of law. If the plaintiff does establish a prima facie case, the defendant must produce some evidence of a legitimate, nondiscriminatory reason for the adverse employment action. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir.), cert. denied, 118 S. Ct. 299 (1997). Once it does so, the burden remains with the plaintiff to prove by a preponderance of the evidence that the proffered reason was pretextual and that unlawful discrimination was the real reason for the employment action. See id.

_____

The central focus of the inquiry in a case such as this is always whether the employer is treating "some people less favorably than others because of their race, color, religion, sex, or national origin." [ International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)]. The method suggested in McDonnell Douglas for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. [ See Teamsters, 431 U.S. at 358 n.44]. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.
Id. at 577.

Requiring that a gender-discrimination plaintiff prove she was replaced by a man, as the District Court instructed the jury here, eliminates no common, lawful reasons for the discharge. If a plaintiff cannot prove that she was qualified for a position or that the employer took an adverse employment action against her, it is clear why her discrimination case should fail. By contrast, a plaintiff 's inability to prove that she was replaced by someone outside of her class is not necessarily inconsistent with her demonstrating that the employer treated her "less favorably than others because of [her] race, color, religion, sex, or national origin." Id. (internal quotation omitted). Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class--which in the present context is presumably true of all but the most misogynistic employers --and does not establish that the employer did not fire the plaintiff on the basis of her protected status.

As we find this issue quite straightforward, we are not surprised to find that seven of the eight federal courts of appeals to have addressed it have held that a plaintiff need not prove, as part of her prima facie case, that she was replaced by someone outside of the relevant class. A leading example is the Seventh Circuit's per curiam opinion in Carson v. Bethlehem Steel Corp., 82 F.3d 157 (7th Cir. 1996). In Carson, the district court had held that the plaintiff 's replacement by someone of the same protected class "prevented her from establishing a prima facie case of discrimination." Id. at 158. Citing O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996) (discussed infra), the court of appeals held that "this understanding of a prima facie case is erroneous." Carson, 82 F.3d at 158. The court gave the following explanation:

An illustration shows why [the understanding was erroneous]. Suppose an employer evaluates its staff yearly and retains black workers who are in the top quarter of its labor force, but keeps any white in the top half. A black

employee ranked in the 60th percentile of the staff according to supervisors' evaluations is let go, while all white employees similarly situated are retained. This is race discrimination, which the employer cannot purge by hiring another person of the same race later.

Id. (citing Connecticut v. Teal, 457 U.S. 440 (1982)).5

_____

5. We made a similar point in a reduction-in-force case applying New Jersey law:

That non-protected employees were terminated along with the plaintiff proves nothing. Suppose that an employer, who has two black employees, needs to terminate five employees for economic reasons. Suppose, further, that the employer decides to take advantage of this situation to get rid of its two African-American employees; it would still be required to terminate three non- protected employees on account of its financial situation. Under the district court's analysis, the black employees could not prevail in a discrimination action [because three white employees were also terminated], even though protected status was the cause for their layoff. Because the rule articulated by the district[court] would allow such unlawful--and unjust--results, we predict that New Jersey would reject it.

Marzano v. Computer Science Corp., 91 F.3d 497, 508-09 n.4 (3d Cir. 1996).

_____

In other words, even if a woman is fired and replaced by another woman, she may have been treated differently from similarly situated male employees. This seems to us to be self-evident. An employer may fire a woman who makes a single mistake (while retaining men who make numerous similar mistakes), yet replace her with another woman whom the employer hopes will meet his (higher) expectations for female employees. Cf. id. at 158-59 ("An employee may be able to show that his race or another characteristic that the law places off limits tipped the scales against him, without regard to the demographic characteristics of his replacement."). Or an employer may fire women who fail to act in a particular manner (e.g., "feminine," assertively, non-assertively), but not require male employees to act in any particular way. Such a requirement would be discriminatory, although an employer applying this double-standard would not necessarily hire a male employee to replace a fired female employee.

Like the Seventh Circuit, the First Circuit has expressly held that, "in a case where an employee claims to have been discharged in violation of Title VII, she can make out the fourth element of her prima facie case without proving that her job was filled by a person not possessing the protected attribute." Cumpiano v. Banco Santander P.R., 902 F.2d 148, 155 (1st Cir. 1990). The court noted that, "while the attributes of a successor employee may have evidentiary force in a particular case, a complainant can satisfy the fourth prong of her prima [facie] case simply by showing that, as here, the employer had a continued need for `someone to perform the same work after the complainant left.' " Id. (citations and brackets omitted).

We agree. The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence. But this fact does not, as a matter of law or logic, foreclose the plaintiff from proving that the employer was motivated by her gender (or other protected characteristic) when it discharged her. We note that, in addition to the First and Seventh Circuits, the Courts of Appeals for the Second, Fifth, Sixth, Eighth, and Eleventh Circuits have held that an instruction such as that involved here is improper in a discrimination case.6

_____

6. See Meiri v. Dacon, 759 F.2d 989, 995-96 (2d Cir. 1985) ("[Requiring] an employee, in making out a prima facie case, to demonstrate that she was replaced by a person outside the protected class. . . is inappropriate and at odds with the policies underlying Title VII."); Nieto v. L&H Packing Co., 108 F.3d 621, 624 & n.7 (5th Cir. 1997) ("While the fact that one's replacement is of another national origin `may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition.' " (quoting Carson)); Jackson v. Richards Med. Co., 961 F.2d 575, 587 n.12 (6th Cir. 1992) ("We wish to make clear . . . that the fact that an employer replaces a Title VII plaintiff with a person from within the same protected class as the plaintiff is not, by itself, sufficient grounds for dismissing a Title VII claim."); Walker v. St. Anthony's Med. Ctr., 881 F.2d 554, 558 (8th Cir. 1989) ("[T]he sex of[plaintiff 's] replacement, although a relevant consideration, is not necessarily a determinative factor in answer to either the initial inquiry of whether she established a prima facie case or the ultimate inquiry of whether she was the victim of discrimination."); Howard v. Roadway Express, Inc., 726 F.2d 1529, 1534 (11th Cir. 1984)

(holding that a district court misstated the law when it concluded that "there can be no racial discrimination against a black person who is not selected for a job when the person who is selected for the job is black" (internal quotation omitted)).

In contrast to these holdings, the Fourth Circuit affirmed a district court's dismissal of a sex discrimination claim by a man because the plaintiff was replaced by another man. See Brown v. McLean, 159 F.3d 898, 905 (4th Cir. 1998) ("In order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class."), cert. denied, 119 S. Ct. 1577 (1999).

_____

We also find guidance in the Supreme Court's decision on a related issue in O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996). In O'Connor, the Supreme Court unanimously rejected the notion that an age-discrimination plaintiff must prove, as part of his prima facie case, that he was replaced by someone outside of the protected class (i.e., persons under the age of 40). The court reasoned:

As the very name "prima facie case" suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a "legally mandatory, rebuttable presumption," [Burdine, 450 U.S. at 254 n.7]. The element of replacement by someone under 40 fails this requirement.. . . The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age.

Id. at 311-12.

As the Court pointed out, an employer appears more motivated by ageism when it replaces a 56 year-old with a 40 year-old (although both are within the protected class under the ADEA), than when it replaces a 40 year-old with a 39 year-old (though the replacement in this example is outside the plaintiff 's protected class). Arguably, the requirement alleged to be error in the present case--that a woman in a gender-discrimination case must demonstrate that she was replaced by a man--is more probative than the requirement rejected in O'Connor. Yet the Court's reasoning applies equally in the gender or race context: "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant [to the prima facie case], so long as [s]he has lost out because of [her gender]."
Id. at 312 (emphasis omitted). As the Court concluded:

[T]he proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . ." Teamsters v. United States, 431 U.S. 324, 358 (1977).
Id. (alterations and omissions in original) (emphasis omitted).

What the Court required in O'Connor is precisely what Pivirotto sought in her requested jury instructions in this case: An instruction that required the jury to find that she had offered evidence "adequate to create an inference" that she was fired because of her sex. We can find no justification for limiting the proof necessary to create this inference to the potentially irrelevant and only marginally probative fact that she was (or was not) replaced by a man.

An employer's failure to hire someone of a different class from the plaintiff, after the plaintiff 's discharge, could be explained in many ways. As the Seventh Circuit noted in Carson, an employer may treat women less favorably than men, but still be willing to hire a woman to fill a position left vacant by the firing of a discriminated-against woman. Or an employer may act on gender-based stereotypes,firing women it perceives as not feminine enough (or as too feminine), or discharging women who are too aggressive while not doing the same to male employees. See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989). Such an employer would not necessarily replace a discriminated-against female employee with a man. Indeed, some employers, anticipating litigation, may hire a woman solely in an attempt to defeat a sex-discrimination claim.

For these reasons, it is inconsistent with Title VII to require a plaintiff to prove that she was replaced by someone outside her class in order to make out a prima facie case. We hold that it is error to require a plaintiff to do so, and

that a jury instruction in a gender- discrimination case that directs the jury to return a verdict in defendant's favor if it does not find that plaintiff was replaced by someone of the opposite gender is consequently erroneous.

B.

ISI argues that we have already held that an instruction like that challenged here is an accurate description of a plaintiff's burden on the fourth element of the prima facie case. We believe ISI reads too much into our jurisprudence in this area. While some of our prior cases may have given the impression that "replacement by someone outside the plaintiff 's class" is a requirement for the prima facie case, they have not so held, and Supreme Court precedent such as McDonnell Douglas, Teamsters, and O'Connor clearly require only "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." O'Connor, 517 U.S. at 312 (internal quotation, brackets, and emphasis omitted).

It is true that in a number of cases, including two en banc cases cited by ISI, we have expressed the fourth element of the prima facie case--when the prima facie case was not in dispute--as replacement of the plaintiff by someone outside of his or her class. In Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997), where the issue before the court was the "problem of interpreting the shifting burden" of St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), the court noted the elements of a prima facie case in a footnote, including a fourth element that "the position was ultimately filled by a person not of the protected class." Sheridan, 100 F.3d at 1065, 1066 n.5 (internal quotation omitted). However, this was not a "holding" of Sheridan, as ISI claims. Similarly, in Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997) (en banc), the court described the fourth element of an age- discrimination prima facie case as "the plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination." Id. at 1108. However, the court did not analyze this description of the prima facie case at all: "[A]lthough the parties dispute whether Keller met [his prima facie burden], we will assume for the sake of argument that he did." Id. The court therefore did not "hold" that replacement by someone outside plaintiff 's class was a required part of the prima facie case, as ISI alleges.

In a number of cases brought under the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"), we have expressed the fourth element of the prima facie case in a manner that might appear to require proof of replacement by someone outside of the relevant class. See, e.g., Maxfield v. Sinclair Int'l, 766 F.2d 788, 792 (3d Cir. 1985) (ADEA case); Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc) (ADEA case, citing Maxfield); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995) (ADEA case, citing Chipollini); Lawrence v. National Westminster Bank N.J., 98 F.3d 61, 68 (3d Cir. 1996) (ADA case, citing Sempier and Chipollini); Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 668 (3d Cir. 1999) (ADA case, citing Lawrence). But each of these decisions can be traced back to Maxfield, in which we rejected a defendant's argument that an ADEA plaintiff must prove that he or she was replaced by someone outside of the protected class, a conclusion later ratified by O'Connor, 517 U.S. at 311-12 (discussed supra).

Despite this holding in Maxfield, in many of the above ADA and ADEA cases that followed Maxfield, we have described the fourth element as requiring the plaintiff to prove that he or she was "ultimately replaced by a person sufficiently outside the protected class to create an inference of discrimination." Lawrence, 98 F.3d at 68. This language, which is inconsistent with Maxfield (and O'Connor), is simply not precise. It is also particularly inappropriate in the present context--gender discrimination --in which the classification of plaintiffs and their replacements is largely categorical (men/women) and not continuous (as with age). Just as nothing in the ADEA requires that an age-discrimination plaintiff prove that he was replaced by someone under the age of 40 (as opposed to someone sufficiently younger to create an inference of discrimination), nothing in Title VII requires a gender-discrimination plaintiff to prove that he or she was "replaced by someone outside the protected class," Maxfield, 766 F.2d at 792, i.e., replaced by someone of the opposite gender.

When actually focusing on the prima facie case, we have repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular that "the fourth element must be relaxed in certain circumstances, as when there is a reduction in force." Torre v. Casio, Inc., 42 F.3d 825, 831 (3d Cir. 1994). Contrary to ISI's assertion, we have never held that the fourth element of the prima facie case should be relaxed only when there is a reduction in force. Rather, this has simply been the most frequent and the most obvious occasion for modifying the typical requirements of the prima facie case. In Torre , we held that a discharged age-discrimination plaintiff who presented

evidence that a younger employee assumed his responsibilities when his employer decided not to replace him had met his prima facie burden. See id. This is the precise factual situation in the present case--i.e., an existing male employee assumed Pivirotto's duties after she was fired. See also Marzano v. Computer Science Corp., 91 F.3d 497, 503 (3d Cir. 1996) (noting that, in a reduction-in- force case, "it is sufficient to show that[plaintiff] was discharged, while the employer retained someone outside the protected class" (internal quotation and brackets omitted)).

We have also held that a plaintiff could meet her prima facie burden by demonstrating generally that "she was either not hired for [a] position or was fired from it under circumstances that give rise to an inference of unlawful discrimination." Waldron v. SL Indus., Inc. , 56 F.3d 491, 494 (3d Cir. 1995) (internal quotation omitted). And in Matczak v. Frankford Candy & Chocolate Co., we held that a plaintiff could make out a prima facie case even without demonstrating that employees outside of the relevant class were treated more favorably, let alone that the plaintiff herself was replaced by someone outside of the relevant class. See 136 F.3d 933, 939 (3d Cir. 1997). In sum, despite some occasionally imprecise language in dicta in certain cases, our jurisprudence is not only internally consistent, but also consistent with the overwhelming majority of caselaw from other circuits, and, more importantly, with Supreme Court precedent. More specifically, our holding today that a gender-discrimination plaintiff need not prove that she was replaced by someone of the opposite gender in order to meet her prima facie burden is entirely consistent with McDonnell Douglas and O'Connor, as well as with our own caselaw directly addressing the requirements of the prima facie case.

III. Harmless Error

Although we hold that the jury instruction challenged in this case was erroneous, we can affirm the judgment in ISI's favor if that error was harmless. See Murray v. United of Omaha Life Ins. Co., 145 F.3d 143, 156 (3d Cir. 1998). We hold that the error was harmless because, "in light of the total record here, we are satisfied that no jury would have found" for the defendant "solely on the basis of the [erroneous] instruction." Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 121 (3d Cir. 1999); cf. Neder v. United States, 119 S. Ct. 1827, 1838-39 (1999) (holding that omission of an element of a crime from a jury instruction is harmless error if the record does not contain sufficient evidence to support a finding that the element was absent).

Initially, we note that despite the evidence that ISI did not "replace" Pivirotto with a new male employee, Pivirotto argued to the jury, in her opening and closing statements, and through the presentation of her case, that she was "eventually replaced by a guy named Bob Keatley." App. at 88; see also id. at 521. The jury therefore might well have concluded that Pivirotto was replaced by a man, which would clearly render the instruction harmless. Moreover, as in Hurley, we believe that in light of the entire record it is highly probable that the jury would have returned the same verdict even if it had been charged on the correct formulation of the prima facie case.

Pivirotto claims that she presented sufficient evidence for the jury to find that she was fired "under circumstances which give rise to an inference of unlawful discrimination," Burdine, 450 U.S. at 253, and therefore it is not highly probable that the jury would have reached the same verdict without the erroneous instruction. First and foremost, she relies on evidence that Colonna made remarks that women were unreliable employees because they get pregnant and because they get breast cancer. Second, Pivirotto notes that her male predecessor was given a month in his position before Fiedler fired him, while Pivirotto was only given about a week in this position before she was terminated. Finally, Pivirotto relies on the fact that Greg Michael, ISI's in-house counsel, was not disciplined even though Fiedler admitted that Michael "had difficulty taking instruction from sales to get things done." There was also evidence that Michael was inexperienced and had trouble fulfilling the requirements of his position. See App. at 603.7

_____

7. Pivirotto also argues that alleged inconsistencies in ISI's stated reasons for her discharge give rise to an inference of discrimination. She claims that ISI proffered various justifications for her discharge, including that (1) she did not do her job to increase sales, (2) she did not have the requisite background and knowledge to do the job, (3) she could not hire and retain qualified sales people, (4) she was unable to train her sales people, and (5) she did not live up to Fiedler's expectations. These reasons, which were offered in ISI's counsel's opening statement to the jury, differ from the justification offered into evidence at trial (i.e., that Pivirotto was creating a wedge between various departments of the company). But as part of the opening statement they were simply contentions, and not evidence

of inconsistencies that might create an inference of discrimination. See Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

It may be true, as Pivirotto argues, that an attorney's clear and unambiguous statements of fact made during opening or closing arguments can constitute judicial admissions under Federal Rule of Evidence 801(d)(2). See, e.g., United States v. McKeon, 738 F.2d 26, 30 (2d Cir. 1984) (citing Oscanyan v. Arms Co., 103 U.S. 261, 263 (1880)); Rhoades, Inc. v. United Air Lines, Inc., 340 F.2d 481, 484 (3d Cir. 1965). However, statements by counsel as to what a party intends to prove at trial are not admissions that the jury can consider in its deliberations. And the court charged that "the statements and speeches of counsel, whether in opening and closings . . . are not evidence, and you should not consider such statements as evidence in the case before you." App. at 542.

In this case, ISI's counsel did not admit a fact that could be offered against it, but simply argued that there were many reasons Pivirotto was fired that had nothing to do with her gender. In proffering legitimate reasons for a plaintiff 's discharge, "[a]n articulation not admitted into evidence will not suffice." Burdine, 450 U.S. at 255 n.9. We therefore give no weight to the arguments of counsel at trial that were not supported by admissible evidence, and find no inconsistencies in ISI's proffered reasons for Pivirotto's discharge. In fact, as noted above, Pivirotto herself testified that Fiedler told her she was being fired because "he felt that I was a wedge between sales and marketing and that my services were no longer compatible with the company," App. at 149, which is precisely the reason given by Fiedler himself at trial, see id. at 404, and so the case was tried on that issue.

_____

 In response, ISI notes that Colonna testified that while he may have made such remarks, he was simply expressing his concern that his company could be destroyed if many of its employees quit at one time due to illness or other circumstances (such as pregnancy). More importantly, while Colonna conceded that he "had the final word" on all personnel decisions, it is undisputed that Fiedler made the decision to fire Pivirotto, and Colonna simply ratified this decision after inquiring from Fiedler whether there was any way to "salvage the situation and keep [Pivirotto] on." Furthermore, Pivirotto offered no evidence that Colonna's remarks, which were not made in the context of any employment decisions involving Pivirotto or anyone else, reflected a generally discriminatory attitude at ISI that may have led to her discharge. Indeed, Pivirotto did not refute Colonna's testimony that, since its founding, at least half of the company's workforce has been female. Moreover, Colonna agreed to hire Pivirotto to a top executive position, which was the third highest paying position in the company at that time, just eight months before she was terminated.

Under our jurisprudence and in the specific context of this case, Colonna's remarks cannot be seen as evidence of a general hostility to women that contributed to Pivirotto's discharge. "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). In Ezold, we found that several "crude and unprofessional" comments, including one very similar to Colonna's (i.e., that female employees were not wanted because of the "problems" they caused), were insufficient, without more, to support a verdict in favor of the plaintiff. See id. at 545-47. Similarly, in the present case, Colonna's insensitive remarks could not form the basis for a jury verdict in Pivirotto's favor.

We also find Pivirotto's evidence of the allegedly better treatment of male employees weak and not probative of discrimination. Even if the jury were instructed properly on the prima facie case, we find it highly probable that "the jury would have reached the same result" on the basis of this evidence. Murray, 145 F.3d at 156-57. Michael was an in-house attorney with very different responsibilities from Pivirotto. While there was some minimal testimony regarding his alleged failings, there was no evidence that female attorneys were treated less favorably than he was. See Ezold, 983 F.2d at 544. Further, evidence of differential treatment of "a single member of the non-protected class is insufficient to give rise to an inference of discrimination." Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998).

Finally, in determining whether similarly situated male employees were treated more favorably, our "focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." Id. at 647. Here, Pivirotto was allegedly fired because "she had demonstrated a tendency to blame others for problems in the sales organization," which "had the effect of driving a wedge between her organization and other parts of the company." She presented no evidence that Michael exhibited a similar "tendency to blame others" or that he was "driving a

wedge between [his department] and other parts of the company."

As for Garcia, while he may have been given slightly more time in his position before being terminated by Fiedler, there is no indication that Pivirotto was held to a higher standard because of her gender. Rather, the evidence is undisputed that as soon as Fiedler determined that Garcia was insisting on a sales approach that Fiedler did not support, he was terminated. See App. at 393. Similarly, as soon as Fiedler determined that Pivirotto was "driving a wedge between her organization and other parts of the company," he fired her. Id. at 404. Fiedler may indeed have been a rush-to-judgment arbitrary fellow. But his trigger finger was apparently as quick with Pivirotto's male predecessor as it was with the female plaintiff, whom, it cannot be forgotten, he had promoted into this top job. In these circumstances, there is just no likelihood that a jury would draw an inference of discriminatory treatment of Pivirotto. This jury did not, and its verdict for ISI must be upheld.

In short, our review of the entirety of the record compels the conclusion that "any error in the [prima facie] instruction could not by any stretch of the imagination change the verdict." Hurley, 174 F.3d at 122. Therefore, the erroneous jury instruction regarding replacement by a man was harmless.

For the foregoing reasons, the judgment of the District Court will be affirmed.

A True Copy: Teste:

Clerk of the United States Court of Appeals for the Third Circuit 25